IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CATHERINE L. ABEL                                                          PLAINTIFF

V.                                    NO. 4:08CV01413 JTR

MICHAEL J. ASTRUE,                                                         DEFENDANT
Commissioner, Social
Security Administration

## MEMORANDUM AND ORDER

## I. Introduction

Plaintiff, Catherine L. Abel, has appealed the final decision of the Commissioner of the Social Security Administration denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Both parties have submitted briefs (docket entries #15, #16).

Judicial review of the Commissioner's denial of benefits examines whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole. 42 U.S.C. §§ 405(g), 1383(c)(3); *Wildman v. Astrue*, 596 F.3d 959, 963 (8th Cir. 2010). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In its review, the Court should consider evidence supporting the Commissioner's decision as well as evidence detracting from it. *Wildman*, 596 F.3d at 964. A decision will not be reversed merely

because substantial evidence would have also supported a contrary outcome, or because the Court would have reached a different conclusion.  *Id.*

On October 18, 2005, Plaintiff filed applications for DIB and SSI, alleging an onset date of October 13, 2005.[1]  (Tr. 8, 347.)  She reported that she was unable to work due to depression, anxiety, diabetes, poor eyesight and acid reflux.  She said she was 5'11" and weighed 350 pounds.  She stated, "I can't wake up. I can't see well.  I want to cry.  Half of the time I don't know if I am coming or going."  She said she quit working because it was "getting harder and harder to get out of bed."  (Tr. 340-41.)  She was forty-one years old at the time of her applications, had completed high school, and had past work experience as a cashier and insurance agent.  (Tr. 332, 341, 345, 347.)

After her claims were denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge (ALJ).  The ALJ conducted a hearing and denied relief on March 20, 2008, and the Appeals Council denied review. (Tr. 36-52, 213-24, 233-36, 406-34.) Plaintiff sought judicial review, and this Court remanded to the Appeals Council, at the Commissioner's request, because

_____

[1]Plaintiff filed earlier applications for DIB and SSI, which were denied by an unfavorable ALJ decision on October 12, 2005.  (Tr. 198-210.)  Plaintiff did not pursue that claim further.  (Tr. 8, 247, 271.)  Some documents in the record relate only to these earlier applications.  (Tr. 94-197, 370-405.)

certain exhibits were missing from the record.  The Appeals Council directed the ALJ to conduct a *de novo* hearing and take any actions necessary to complete the record. (Tr. 237-41.)  On October 14, 2009, the ALJ conducted a second hearing, at which Plaintiff, her mother, and a vocational expert testified.  (Tr. 62-93.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i) & (b), § 416.920(a)(4)(i) & (b).  If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience.  *Id.*

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities.  *Id.* § 404.1520(a)(4)(ii) & (c), § 416.920(a)(4)(ii) & (c).  If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment, which is presumed to be disabling.  *Id.* § 404.1520(a)(4)(iii) & (d), § 416.920(a)(4)(iii) & (d). If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has a sufficient residual

functional capacity (RFC), despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.* § 404.1520(a)(4)(iv) & (f), § 416.920(a)(4)(iv) & (f). If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.* § 404.1520(a)(4)(v) & (g), § 416(a)(4)(v) & (g). If so, benefits are denied; if not, benefits are awarded. *Id.*

In his March 12, 2010 decision (Tr. 8-21), the ALJ found that Plaintiff: (1) did not engage in substantial gainful activity from October 13, 2005 (her alleged onset date) until July 1, 2007, or for any period after October 31, 2009; (2) had "severe" impairments of diabetes mellitus, depression with anxiety, obesity, coronary artery disease (CAD), and a vision impairment; (3) did not have an impairment or combination of impairments that met or equaled a listed impairment; (4) had the RFC for a limited range of sedentary unskilled work: *i.e.*, the ability to lift and carry ten pounds occasionally and less than ten pounds frequently, to stand and walk for two hours during an eight-hour workday, to sit for six hours during an eight-hour workday, and to frequently climb, balance, crawl, kneel, crouch and stoop; but the inability to perform work requiring excellent vision; and, non-exertionally, moderate limitations in her ability to understand, remember and carry out detailed instructions, to make

-4-

judgments on detailed work-related decisions, to interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and routine work changes; (5) was not fully credible regarding the intensity, persistence and limiting effects of her symptoms; (6) was unable to perform any past relevant work; but (7) considering her age, education, work experience and RFC, and based on the testimony of the vocational expert, was able to perform other jobs that exist in significant numbers in the national economy.   Thus, the ALJ concluded that Plaintiff was not disabled.   Plaintiff did not seek review from the Appeals Council, making the ALJ's decision the final decision of the Commissioner.   Plaintiff then appealed the denial of benefits to this Court (docket entry #2).

## II. Analysis

Plaintiff argues that the ALJ erred: (1) in failing to consider her impairments in combination; (2) in discounting the credibility of her subjective complaints; (3) in assessing her physical and mental RFC; and (4) in formulating the hypothetical question he asked the vocational expert.   For the reasons discussed below, the Court concludes that Plaintiff's arguments are without merit.

A.   <u>Relevant Medical Evidence and Hearing Testimony</u>.

1.   <u>Evidence Regarding Physical Impairments</u>.

From 1998 to 2004, Plaintiff received treatment from her primary care

physicians for adult onset diabetes mellitus, diabetic ulcers, lumbar strain, cellulitis, abdominal myalgias, acid reflux, yeast vulvitis, and "classic symptoms of quite elevated sugars." (Tr. 447-53, 513-19.)

On November 2, 2005, she was hospitalized for complaints of intermittent chest discomfort, weakness and dizziness, and shortness of breath. She was taking no medications and said she did not monitor her diabetes as instructed. Dr. Michael Kaploe admitted her for treatment, observation and testing. (Tr. 460-63, 470.)

A heart catherization showed "normal left ventricular function" and "hemodynamically insignificant coronary disease." (Tr. 466.) Dr. Kaploe characterized this as "essentially normal." (Tr. 456.) The physician who evaluated her cardiac condition, Dr. D.A. Henry, "strongly urged" her to stop smoking and take appropriate medical therapy for dyslipidemia and diabetes. (Tr. 466-67.) A hepatobiliary scan showed "delayed isotopic filling of the gallbladder that could be on the basis of chronic cholecystitis" (gallbladder inflammation). (Tr. 468.) However, again, essentially normal results were obtained from abdominal and pelvic CT studies, an abdominal ultrasound, and an upper gastrointestinal series. (Tr. 456-57, 464-65.)

On November 8, 2005, Plaintiff was discharged in satisfactory condition, with no restrictions on her activities. Dr. Kaploe reviewed her course of treatment and all

testing results.  His diagnoses were: hemodynamically insignificant coronary artery disease; chest pain, resolved; gastroespohpageal reflux; diabetes mellitus type two, poorly controlled; morbid obesity; nicotine dependence; and noncompliance. Adjustments were made in her medications, she was given diabetic supplies (glucose meter, strips and lancets), and diabetes education was provided.  Dr. Kaploe instructed her that she "needed to make significant lifestyle changes in order to prevent further deterioration of her health," including weight loss, smoking cessation, active blood sugar monitoring, and increased physical activity.  (Tr. 454-57.)

On January 1, 2006, Dr. Ronald M. Crow, a state agency medical specialist, completed a physical RFC assessment based on Plaintiff's medical records.  (Tr. 213, 475-82, 558-64.)  He concluded that she had: the ability to occasionally lift/carry fifty pounds, to frequently lift/carry twenty-five pounds, to stand/walk about six hours in an eight-hour workday, to sit about six hours in an eight-hour workday; unlimited ability to push/pull; and no postural, manipulative, visual, communicative or environmental limitations. (Tr. 476-79.)  Dr. Bill F. Payne reviewed the evidence and affirmed the assessment.  (Tr. 215, 510, 552.)

On September 12, 2006, Plaintiff sought treatment for a "pulled muscle" in her back.  Views of her lumbar spine showed "disc height loss at L1-2 with endplate spurring" and "sclerosis of the facet joints at L5-S1."  (Tr. 522-24.)

Additional records from her primary care physicians, from August 2007 to July 2009, indicate that she was treated for restless leg syndrome, adult onset diabetes with poor compliance, hyperlipidemia, vasomotor symptoms, chronic diarrhea, obesity, vaginitis, and right wrist tendinitis.  (Tr. 566-74.)  From April 2008 to October 2009, she was treated at a foot care clinic for cellulitis of the left great toe.  (Tr. 576-85.)

2.    Evidence Regarding Mental Impairments.

On May 25, 2006, Dr. Steve A. Shry, a clinical psychologist, evaluated Plaintiff at the request of the SSA.  (Tr. 486-89, 553.)  Dr. Shry observed that Plaintiff spoke in a "dramatic fashion," tended to "ramble," was vague, and evidenced some inappropriate affect.  Dr. Shry said she "appeared unmotivated as evidenced by numerous flippant responses."  She reported that she had auditory hallucinations and daily suicidal ideation, but seemed lucid during the session and evidenced no psychotic process.  She said she "cries all the time" and "stay[s] tired."  She denied any difficulties with social relationships.  Dr. Shry estimated her IQ as in the "borderline range," but stated that she "was somewhat unmotivated in taking the exam" and "could have possibly performed at a higher level than estimated."  He said her cognitive level appeared to be at the upper end of the borderline range intellectually, possibly low average level, and she did "not appear to be significantly impaired in adaptive functioning."  Assessing her concentration, persistence and pace,

-8-

he stated that she appeared "somewhat distractible and performed sporadically" during the session.  His diagnostic impression was "R/O [rule out] Borderline Personality Disorder."  As to the validity of his results, he reiterated that Plaintiff appeared "somewhat unmotivated" during the session.

On June 29, 2006, Dr. Dan Donahue, a state agency medical specialist, completed a Psychiatric Review Technique form and a mental RFC assessment based on his review of the medical evidence.  (Tr. 490-93, 496-509, 551-57.)  He found that Plaintiff had "symptoms of a significant mental disorder," which resulted in mild restrictions in her activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence or pace, but with no evidence of episodes of decompensation. (Tr. 506, 508.) He further found that she was moderately restricted in her ability: to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and work week without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work place; and to set realistic goals or make plans independently of others.  He concluded that she was able to perform work where

-9-

"interpersonal contact is routine but superficial, e.g., grocery checker," where "tasks are learned by experience, there are several variables, and limited judgment is required," and where the supervision required "is little for routine tasks but detailed for non-routine tasks." (Tr. 492.)

On May 3, 2007, Plaintiff sought treatment from Counseling Associates due to depression, thoughts of suicide, and worries over legal issues. She reported being depressed for the past six months since she and her boyfriend had been arrested for manufacturing methamphetamine. She said she used methamphetamine daily from age 39 to 42 (2002-2005) but had been "clean" for eighteen months. The counselor's diagnoses were: major depressive disorder, recurrent; and amphetamine dependence, early full remission. Plaintiff was instructed to continue abstinence from methamphetamine, and goals were set to elevate her mood and eliminate suicidal ideations. (Tr. 525-32.)

On August 9, 2007, she returned to Counseling Associates, maintaining that she wished everyone would leave her alone and she had "nothing to live for." However, as noted by the counselor, she went on to talk about things she enjoyed, including work, her family's company, and looking forward to selling her house and moving. (Tr. 534.)

      3.    Plaintiff's Hearing Testimony.

At the hearing before the ALJ in October 2009, Plaintiff testified that she washed dishes but did not sweep, mop or vacuum because, about two years earlier, she had "some trouble with [her] gallbladder and so that movement hurts." (Tr. 77-78.) She said she could walk for "maybe five minutes" because her ankles "get really bad," her legs "start hurting," and her thighs "go numb." (Tr. 81.) She said that up until six months earlier, she did her own grocery shopping and had "a little bit" of trouble getting around the store but "not major." She said her main difficulty in shopping was with depth perception and hand numbness. (Tr. 80-83.) She said she liked to read and watch TV, but usually fell asleep "because I'm just that tired 24/7." (Tr. 84.) Most of her testimony concerned her vision problems, which had "gotten worse" in the past six to seven months. (Tr. 79-80, 87-88.)

B.   Plaintiff's Arguments.

1.   Combination of Impairments.

Plaintiff first argues that the ALJ "sidestepped" the requirement that her impairments be considered in combination. In his decision, the ALJ correctly stated that he had to consider, at step two of the sequential process, whether Plaintiff had a severe impairment or a "combination of impairments" that was severe, and, at step three, whether Plaintiff's impairment or "combination of impairments" meets or medically equals the criteria of a listing. (Tr. 10.) He also correctly stated that he had

-11-

to consider, in assessing Plaintiff's RFC, "all of [her] impairments, including impairments that are not severe." (Tr. 10.) He found that the specified impairments were severe "because, singly, and in combination," they significantly limited her ability to perform basic work activities. (Tr. 11.) He expressly found that Plaintiff "does not have an impairment or combination of impairments" that meets or medically equals a listed impairment, specifically addressing her diabetes, CAD, vision impairments, obesity, and mental impairments. (Tr. 12.) He also stated that he was considering "all the evidence" and "the entire record" in making his findings, including his RFC determination. (Tr. 9, 11, 13, 14, 18.) He discussed the medical evidence regarding Plaintiff's physical and mental impairments, including those he found to be non-severe. (Tr. 11-19.)

This record is sufficient to demonstrate that the ALJ considered Plaintiff's impairments in combination, as required by the regulations and other relevant authority. *See* 20 C.F.R. § 404.1523, § 404.1526(b)(3), § 404.1545(a)(2), § 416.923, § 416.926(b)(3), § 416.945(a)(2); *Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994) (where ALJ found claimant did not have impairment or combination equaling listing-level impairment and referred to evidence as a whole, ALJ properly considered combined effect of impairments).

2.   Credibility.

Plaintiff contends that the ALJ improperly disregarded her testimony and subjective allegations of pain, discomfort, and fatigue, as supported by "years of documented medical evidence."

A claimant's subjective complaints may be discounted if they are inconsistent with the record as a whole. *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010). The ALJ is in the best position to gauge credibility and is granted deference in that regard if his findings are adequately explained and supported. *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008). *See* 20 C.F.R. § 404.1529(c) § 416.929(c) (listing factors to consider); *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); SSR 96-7p, 1996 WL 374186, at *3, *5 (July 2, 1996). However, an ALJ need only acknowledge and consider these factors, and need not explicitly discuss each one. *Halverson*, 600 F.3d at 932.

Here, the ALJ stated that he had considered Plaintiff's statements about her symptoms in light of the objective medical evidence and other evidence, and in accordance with the applicable rules and regulations, citing § 404.1529, § 416.929 and SSR 96-7p. (Tr. 13.) He found that, while Plaintiff's impairments reasonably could be expected to cause pain and other symptoms, her statements concerning the intensity, persistence and functionally limiting effects were "not credible to the extent they are inconsistent" with the RFC assessment. (Tr. 14, 15.) The ALJ's discussion

(Tr. 14-18) identified the following specific evidence which undermined her credibility.

The ALJ cited and discussed Plaintiff's "longstanding history" of uncontrolled diabetes and noncompliance with her medications and diet, despite being repeatedly advised and educated about the importance of compliance. (Tr. 15-16, 18-19.)  He also noted her failure to comply with the treatment recommendations given after her cardiac work-up: statin therapy and cessation of smoking. (Tr. 16.)  Noncompliance with a physician's directions or prescribed treatment is a valid reason to discredit a claimant's subjective allegations.  *Wildman*, 596 F.3d at 968-69 (failure to comply with prescribed diet and medications); *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (failure to take prescribed medications and quit smoking).

The ALJ further noted that, while Plaintiff sought treatment for her other allegedly disabling physical impairments,[2] the treatment she received was "essentially routine and/or conservative in nature." (Tr. 19.)  He discussed her November 2005 hospitalization, noted that her cardiac work-up was essentially normal, and observed that she had no ongoing treatment for digestive system disorders. (Tr. 14, 19.)  He

_____

[2]Plaintiff does not challenge the ALJ's evaluation of her vision impairments, including total vision loss in one eye, diabetic retinopathy, early glaucoma, and cataracts. The ALJ discussed the relevant evidence and included visual restrictions in his RFC. (Tr. 12, 13, 14, 16, 18, 536-45.)

also addressed the medical evidence of Plaintiff's complaints of "back and lower extremity" pain and numbness, properly concluding that there was no evidence of "anything other than conservative care," of any referral to a specialist, or of any prescribed pain medications. (Tr. 15, 19.) This type of evidence is inconsistent with allegations of disabling physical impairments. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (relevant factor in credibility determination is lack of objective medical evidence for alleged pain).

The ALJ also noted that, although Plaintiff reported that she did not have money for medicine or medical care, there was no evidence that she had ever been refused medical treatment or that she had contacted any charitable organizations in an effort to obtain medical care. (Tr. 15.) He also noted that she continued to smoke, indicating that she "has some money to spend on medical care but chooses to spend it on cigarettes." (Tr. 15, 16.) *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (failure to take prescription pain medication was relevant to credibility determination where claimant said she could not afford treatment but there was no evidence she was ever denied medical treatment due to financial reasons); *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992).

The ALJ also observed that, although Plaintiff alleged disability beginning in October 2005, she had worked at substantial gainful activity levels between May 2007

and August 2008, was working at the time of the October 2009 administrative hearing, and had attested that she was ready, willing and able to work in order to receive unemployment benefits in late 2008 and part of 2009.  (Tr. 11, 89, 287-88, 437.) Plaintiff testified that she stopped working for one employer in August 2008 because it went out of business and she "probably" would have continued had it not closed. (Tr. 89.)  She later began working with her mother as a receptionist at a trucking company, and was working full-time at the time of the hearing.  Her mother testified that her boss recommended Plaintiff for the job because the boss "always liked" Plaintiff and she "was real good" with talking to the truck drivers.  (Tr. 70-71, 73-74, 85, 89-90.)  Her mother also testified that Plaintiff did not take any breaks "other than sit back and close her eyes and rest once in a while."  (Tr. 73.)  This evidence provides valid reasons for discounting Plaintiff's assertions that she was unable to work during the applicable time period due to disabling pain and fatigue.  *See Goff*, 421 F.3d at 792-93 (claimant's ability to work in the past with alleged impairments demonstrates they are not presently disabling; relevant factor in credibility analysis is whether claimant leaves work for reasons other than medical condition); *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) (claimant's acceptance of unemployment benefits, although not dispositive, is facially inconsistent with a claim of disability).

The ALJ's credibility analysis substantively and adequately covered the relevant

considerations, and he provided good reasons supported by substantial evidence for not fully accepting Plaintiff's subjective complaints.  While there is evidence in the record both supporting and detracting from the ALJ's conclusion that Plaintiff was not credible, the ALJ was able to observe Plaintiff during her testimony at the hearing and this, in addition to the medical and other evidence in the record, convinced the ALJ that she was not fully credible.  Under these circumstances, the ALJ was in the best position to make a credibility determination, and the Court will defer to that determination.  *See Steed*, 524 F.3d at 876.

    3.   RFC Assessment.

Plaintiff argues that, in evaluating the evidence and formulating her RFC, the ALJ: neglected to discuss "in any detail" her diagnosed right ankle pain, personality disorder, sclerosis of the facet joints in the lumbar spine, or borderline intellectual functioning; failed to say how the effects of her obesity were considered; and failed to properly evaluate her mental impairments.

It is significant that Plaintiff did not expressly allege, in her application for benefits, disability due to ankle or back problems, obesity, a personality disorder, or borderline intellectual functioning.  (Tr. 340-41.)  *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001).  Nevertheless, the ALJ addressed the medical evidence of Plaintiff's complaints of "back and lower extremity pain," as well as her obesity

-17-

and the need for her to eat a proper diet and lose weight to control her diabetes and other conditions. (Tr. 12, 15-16, 18-19.) His RFC assessment limited her to sedentary work, which took into account a significant degree of functional limitation due to these physical conditions.

The ALJ also adequately addressed her mental impairments and stated that the effects of those impairments had been factored in to his RFC assessment. (Tr. 16-17.) He noted that Plaintiff did not seek professional mental health treatment until May 2007, almost two years after she applied for benefits.  At that time, she reported a six-month history of depression, triggered by criminal drug charges against her and her boyfriend.  The ALJ also noted that her treatment appeared successful as the counselor did not note any suicidal ideation in August 2007, and there is no evidence that any medication was prescribed to treat any psychologically based symptoms.  (Tr. 17.)

The ALJ thoroughly discussed Dr. Shry's evaluation and findings, including his impression of "rule out borderline personality disorder,"[3] and his estimate of intellectual functioning in the borderline range.  (Tr. 17.)  However, Dr. Shry did not make a definitive diagnosis of borderline personality disorder, and he questioned the

---

[3]This disorder is characterized by pervasive instability in moods, interpersonal relationships, self-image and behavior.  National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/borderline-personality-disorder-fact-sheet/index.shtml.

validity of the intelligence testing due to Plaintiff's lack of motivation.  Neither diagnosis was made at Counseling Associates.  The ALJ accounted for some cognitive and psychological limitations in his RFC, finding that she was moderately limited in her ability to understand, remember and carry out detailed instructions, to make judgments on detailed decisions, to interact appropriately with supervisors and co-workers, and to respond appropriately to work situations.

Other evidence in the record contradicts limited cognitive and social functioning, including evidence that Plaintiff completed high school without attending special education classes, "did some college" (where she "made the dean's list"), and was able to obtain a license as an insurance agent.  Her therapist at Counseling Associates found that she was of "average" intelligence.  (Tr. 347, 389, 412, 531.) Additionally, there was testimony that she obtained her job at the trucking company because her mother's boss "always liked" Plaintiff and she "was real good" with talking to the truck drivers.  (Tr. 73-74.)

4.     Hypothetical Question to Vocational Expert.

Finally, Plaintiff argues that the ALJ neglected to include her obesity or borderline intellectual functioning in the hypothetical question he asked the vocational expert. A hypothetical question need include only those impairments or restrictions that are supported by the record and that the ALJ accepts as valid.  *Howe v. Astrue*,

499 F.3d 835, 842 (8th Cir. 2007).  By limiting the RFC to sedentary work and including other nonexertional restrictions, the ALJ acknowledged and accounted for some degree of functional restrictions due to obesity and cognitive impairments.  Any further limitations were properly discredited as not supported by the evidence, as explained above.

### III. Conclusion

After a careful review of the entire record and all arguments presented, the Court finds that Plaintiff's arguments for reversal are without merit and that the record as a whole contains substantial evidence upon which the ALJ could rely in reaching his decision.  The Court further concludes that the ALJ's decision is not based on legal error.

IT IS THEREFORE ORDERED THAT the final decision of the Commissioner is affirmed and Plaintiff's Complaint is DISMISSED, WITH PREJUDICE.

DATED THIS 16th DAY OF May, 2011.

_____
UNITED STATES MAGISTRATE JUDGE